**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |  |
|---|---|---|
| | * | |
| **KEEZIO GROUP, LLC,** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | **Civ. No. MJM-25-1389** |
| **v.** | * | |
| | * | |
| **U.S. CONSUMER PRODUCT SAFETY** | * | |
| **COMMISION, et al.,** | * | |
| | * | |
| **Defendants.** | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \*

**MEMORANDUM OPINION**

Keezio Group, LLC ("Plaintiff" or "Keezio") filed this civil action after the United States Consumer Product Safety Commission issued a press release warning consumers about risks to infants associated with one of Keezio's products. ECF No. 1. The matter is before the Court on Defendants' motion to dismiss for lack of jurisdiction and failure to state a claim. ECF No. 20. No hearing is necessary to resolve the pending motion. *See* Loc. R. 105.6 (D. Md. 2025). For the reasons stated herein, Defendants' motion shall be granted.

## I.    PROCEDURAL HISTORY

On May 1, 2025, Keezio filed a two-count Complaint against the United States Consumer Product Safety Commission ("CPSC"); Peter A. Feldman, in his official capacity as Acting Chairman of the CPSC; and Jennifer Sultan, in her official capacity as Acting Director of the Office of Compliance and Filed Operations for the CPSC (collectively, "Defendants"). *See* ECF No. 1 ("Compl."). The Complaint alleges unlawful agency action under the Administrative Procedure Act ("APA") and a violation of the Fifth Amendment's Due Process Clause. *Id.*

1

On August 7, 2025, Defendants moved to dismiss for lack of jurisdiction and failure to state a claim. ECF No. 20. Keezio filed a response in opposition on September 4, 2025, ECF No. 23, and Defendants filed a reply on November 24, 2025. ECF No. 27. Keezio also filed a Motion to Take Judicial Notice of Government Record on September 4, 2025, ECF No. 24, which is unopposed and shall be granted.

## II.    FACTUAL BACKGROUND

Keezio is a California corporation that designs, manufactures, imports, and sells infant and toddler sleep products. *See* Compl. ¶¶ 8, 16. It sells products both through its own e-commerce website as well as through Amazon as a "third-party logistics provider." *Id.* at ¶¶ 18–19.

The United States Consumer Product Safety Commission ("CPSC") is a federal agency established by Congress to "protect the public against unreasonable risks of injury associated with consumer products," "assist consumers in evaluating the comparative safety of consumer products," and "develop uniform safety standards for consumer products." 15 U.S.C. §§ 2051(b)(1)–(3), 2053(a). CPSC carries out those missions by exercising various statutory authorities, including under the Consumer Product Safety Act ("CPSA"), 15 U.S.C. § 2051 et seq. CPSC is headquartered in Bethesda, Maryland and has a testing facility in Rockville, Maryland. Compl. ¶ 9.

Children's products such as Keezio's are subject to mandatory safety standards and enforcement by CPSC. *Id.* ¶ 38 (citing 15 U.S.C. § 2051). Keezio's products include play yards[1]

---

[1] A play yard, or playpen, "is a framed enclosure that includes a floor and has mesh or fabric sided panels primarily intended to provide a play or sleeping environment for children. It may fold for storage or travel." Compl. ¶ 26.

and original equipment manufacturer ("OEM") replacement play yard mattress pads, including model HP-TPM-2, sold under the "hiccapop" brand name. *See* Compl. ¶¶ 8, 22.[2]

On November 18, 2024, CPSC issued a Notice of Violation stating that it had obtained Keezio products from Amazon, tested the "hiccapop Pack and Play Mattress Pad Model HP-TPM-2" (the OEM Replacement Mattress), and determined that the product failed to comply with one or more provisions of 16 C.F.R. part 1241. Compl. ¶ 66. The Notice, signed by Senior Compliance Officer Joseph Williams, directed Keezio to stop selling the "crib mattresses." *Id.* ¶¶ 70, 74.

Keezio alleges that CPSC applied the wrong standard. Specifically, Keezio contends that CPSC improperly applied 16 C.F.R. part 1241, when it should have applied 16 C.F.R. part 1221 to the OEM Replacement Mattress. *Id.* ¶ 67.

The test summary accompanying the Notice included a photograph of a mattress labeled as manufactured in May 2024.[3]  *Id.* ¶ 68. The Notice did not limit its "stop sale" directive to mattresses from that production period; instead, it broadly directed Keezio to stop selling the "crib mattresses." *Id.* ¶ 71.

Keezio alleges that CPSC did not have the HP-TRAVELPOD-DPM play yard (the "DPM Play Yard") to use when testing the May 2024 OEM Replacement Mattress. *Id.* ¶ 75. According to Keezio, this omission is critical because the applicable testing protocol requires placing the mattress into its intended play yard and measuring any gaps between the mattress and the play yard's interior walls. Without the corresponding play yard, Keezio alleges, proper testing cannot be performed. *Id.* ¶ 76.

---

[2] Keezio refers to the HP-TPM-2 mattress as the "OEM Replacement Mattress." Compl. ¶ 22. This memorandum opinion adopts that reference.

[3] In May 2024, Keezio manufactured 13,944 OEM Replacement Mattresses. Compl. ¶ 69.

In December 2024, Keezio provided CPSC with materials it believed necessary for proper testing under 16 C.F.R. part 1221, including: (1) a DPM Play Yard; (2) a "v2" play yard and its corresponding mattress (not yet available for sale); and (3) a prototype mattress made with new shell material and not intended for use with either play yard. *Id.* ¶ 78. Keezio requested retesting under part 1221 rather than part 1241. *Id.* ¶¶ 67, 78. On January 13, 2025, CPSC issued a Results of Sample Analysis Report for the DPM Play Yard that did not identify performance violations but continued to apply 16 C.F.R. part 1241. *Id.* ¶ 79.

Keezio alleges that CPSC conducted improper testing. According to the Complaint, CPSC tested the DPM Play Yard using the prototype mattress rather than the May 2024 OEM Replacement Mattress. *Id.* ¶ 80. It also allegedly tested the May 2024 mattress with the v2 play yard—despite the mattress being labeled for use with the DPM Play Yard—and concluded that the mattress did not fit the v2 play yard. *Id.* ¶ 81. Keezio further alleges that CPSC did not test the May 2024 mattress with the DPM Play Yard at all. Instead, CPSC allegedly compared its measurements to the prototype mattress, determined that it was one and a half inches shorter, concluded it would not fit the DPM Play Yard, and issued a second failing report. *Id.* ¶ 82.

After receiving the January 13, 2025, test results, Keezio provided videos demonstrating proper fitment of the May 2024 mattress in the DPM Play Yard. *Id.* ¶ 83. Keezio alleges that CPSC did not consider these materials and instead issued an Amended Notice of Violation that again directed Keezio to recall the "hiccapop" mattress. *Id.* ¶ 84. The Amended Notice also stated that CPSC tested the "hiccapop Play Yard" (i.e., the v2 play yard not yet available to consumers) and found that it failed to comply with ASTM F406, 16 C.F.R. § 1221.2. *Id.* ¶ 85. CPSC also directed Keezio to stop selling the play yard, despite the fact that this product was not yet on the market. *Id.* ¶ 86.

On March 5, 2025, CPSC's Division of Regulatory Enforcement notified Amazon by email that it would issue a unilateral press release the following day regarding Keezio's OEM Replacement Mattress. *Id.* ¶ 87. CPSC did not notify Keezio before contacting Amazon. *Id.* The email instructed Amazon to send the press release to all customers who had purchased any OEM Replacement Mattress on Amazon—not just those from the May 2024 production. *Id.* ¶ 88. Less than thirty minutes after emailing Amazon, CPSC informed Keezio's counsel of the planned press release. *Id.* ¶ 89.

On March 6, 2025, at 1:23 a.m., Keezio responded that it had been denied due process and that the press release would harm its reputation and goodwill. *Id.* ¶ 93. Keezio requested review by CPSC's General Counsel or, alternatively, a hearing before the Commission. *Id.* ¶ 94. CPSC did not respond and proceeded to publish the press release later that day (the "Press Release"). *Id.* ¶¶ 95, 101.

The Press Release advised consumers to stop using Keezo's OEM Replacement Mattresses immediately due to a risk of "Serious Injury or Death from Entrapment or Suffocation." *Id.* ¶ 102. Amazon distributed the notice to approximately 108,000 customers and offered refunds at Keezio's expense. *Id.* ¶¶ 103, 104, 124. Nearly 34,000 customers requested refunds—far exceeding the number of May 2024 units sold—totaling approximately $1.2 million. *Id.* ¶ 125. Amazon did not require proof of disposal, instead allowing customers to certify destruction. *Id.* ¶¶ 104, 112. It also removed all Keezio OEM Replacement Mattresses from its platform, regardless of production date. *Id.* ¶ 127.

## III.    STANDARD OF REVIEW

A defendant may move to dismiss a complaint for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). The plaintiff bears the burden of establishing the court's

subject matter jurisdiction. *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999) (citing *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991)). "[W]hether an agency's action 'constituted final agency action under the APA so as to be reviewable in court' is 'a question of subject matter jurisdiction.'" *Am. Acad. of Pediatrics v. FDA*, 379 F. Supp. 3d 461, 474 (D. Md. 2019) (quoting *Invention Submission Corp. v. Rogan*, 357 F.3d 452, 458 (4th Cir. 2004)). Where, as here, a defendant raises a facial challenge under Rule 12(b)(1)—arguing that the complaint fails to allege facts sufficient to establish jurisdiction—the court accepts the complaint's allegations as true and affords the plaintiff the same procedural protections as under Rule 12(b)(6). *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982).

Under Rule 12(b)(6), a complaint must be dismissed if it "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss under Rule 12(b)(6), the pleading must state a "plausible claim for relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). A claim is plausible when the facts alleged permit the court to draw a reasonable inference that the defendant is liable. *Id.* at 678. Rule 12(b)(6) "tests the sufficiency of a complaint"; it does not resolve factual disputes or the merits of a claim. *Velencia v. Drezhlo*, Civ. No. RDB-12-237, 2012 WL 6562764, at *4 (D. Md. Dec. 13, 2012) (quoting *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006)).

When evaluating motions under Rules 12(b)(1) and 12(b)(6), the court may take judicial notice of facts "not subject to reasonable dispute" because they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). "Specifically, the court may take judicial notice of publicly available information on state and federal government websites without converting the motion to one for summary judgment." *Est. of Green v. City of Annapolis*, 696 F. Supp. 3d 130, 147 (D. Md. 2023) (citing

*U.S. v. Garcia*, 855 F.3d 615, 621 (4th Cir. 2017)). The court may also consider documents incorporated into the complaint by reference. *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016).

### IV. DISCUSSION

#### A. APA Review

The first count of the Complaint asserts a claim under the APA that CPSC's issuance of the Press Release was an abuse of discretion and an unlawful, arbitrary and capricious agency action. The APA permits judicial review of a "final agency action for which there is no other adequate remedy in a court . . . ." 5 U.S.C. § 704. The statute "waives the federal government's sovereign immunity from suit and permits federal court review of final agency actions." *Maryland v. Smith*, 766 F. Supp. 3d 498, 511 (D. Md. 2025) (quoting *COMSAT Corp. v. Nat'l Sci. Found.*, 190 F.3d 269, 274 (4th Cir. 1999)) (cleaned up). Under the APA, district courts "have jurisdiction to set aside agency action that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' including action that is 'contrary to constitutional right, power, privilege, or immunity.'" *Id.* at n.18 (quoting 5 U.S.C.A. § 706(2)(A)–(B)). In the Fourth Circuit, the question of whether an agency action is a reviewable final agency action is a jurisdictional issue. *See Jake's Fireworks Inc. v. U.S. Consumer Prod. Safety Comm'n*, 105 F.4th 627, 631 (4th Cir. 2024), *cert. denied*, 145 S.Ct. 2700 (2025) (explaining that the APA waives the federal government's sovereign immunity and "[b]ecause sovereign immunity is jurisdictional in nature, finality under the APA is a jurisdictional requirement") (citation modified). Defendants argue that this Court lacks subject-matter matter jurisdiction because the Press Release is not a "final agency action." Def. Mem. (ECF No. 20-1) at 8–16.

Keezio argues that CPSC's "unilateral" Press Release constitutes a final agency action because it represents a "final disposition" of the agency's decision-making process—i.e., it is an "order" under 5 U.S.C. § 551(6)—and is subject to statutory and regulatory requirements ensuring accuracy and fairness. Pl. Opp'n (ECF No. 23) at 9–11. Moreover, Keezio contends, the Press Release marked the consummation of CPSC's process, following testing, notices of violation, and Keezio's unsuccessful attempts to respond or seek review. *See id.* at 14–17. According to Keezio, CPSC's determination that the May 2024 production OEM Replacement Mattress failed to comply with one or more provisions of 16 C.F.R. part 1241 "set in motion legal obligations upon the Commission," leading to final agency action. *Id.* at 17. Specifically, Keezio argues that CPSC was obligated "to determine that publication of a unilateral press release was accurate and not misleading. Whether or not the Commission reached the correct conclusion, before it could publish the unilateral press release, it had to reach a conclusion, and it had to be final." *Id.*

The APA defines "agency action" to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act . . . ." 5 U.S.C. § 551(13); *see also Veterans Legal Servs. Program v. U.S. Dep't of Def.*, 990 F.3d 834, 839 (4th Cir. 2021) (noting that § 551(13) "refers only to conduct that is 'circumscribed' and 'discrete'" (quoting *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 62 (2004))). To be subject to review under the APA, "the 'agency action' must be 'final.'" *Nat'l Ass'n for the Advancement of Colored People v. Bureau of the Census* ("*NAACP*"), 945 F.3d 183, 189 (4th Cir. 2019) (quoting *Vill. of Bald Head Island v. U.S. Army Corps of Eng'rs*, 714 F.3d 186, 194 (4th Cir. 2013)). An agency action must satisfy two conditions to be deemed "final" under the APA. *Id.*; *see also U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016). First, the action must "mark the 'consummation' of the agency's decisionmaking process[.]" *Bennett v. Spear*, 520 U.S. 154, 178

(1997) (quoting *Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948)). Second, "the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow[.]'" *Id.* at 178 (quoting *Port of Boston Marine Terminal Assn. v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)).

Several courts, including a judge of this Court, have found or suggested that press releases do not constitute final agency action subject to APA review. *See Pharm. Mfrs. Ass'n v. Kennedy*, 471 F. Supp. 1224, 1227–33 (D. Md. 1979); *Arrow Reliance, Inc. v. Califf*, No. 2:22-cv-1057, 2022 WL 3104102, at *4 (W.D. Wash. Aug. 4, 2022) ("The APA clearly defines when agency action occurs, [and] the issuing of a notice or press release is not included in that definition."); *Barry v. U.S. S.E.C.*, No. 10-CV-4071 CBA, 2012 WL 760456, at *5–6 (E.D.N.Y. Mar. 7, 2012); *Hoxsey Cancer Clinic v. Folsom*, 155 F. Supp. 376, 378 (D.D.C. 1957); *Hearst Radio v. FCC*, 167 F.2d 225, 226–27 (D.C. Cir. 1948) (FCC publication, containing allegedly defamatory information about station owner, did not satisfy "the statutory definition of 'agency action'"). *Cf. Pub. Util. Dist. No. 1 of Snohomish Cnty., Washington v. Bonneville Power Admin.*, 250 F. App'x 821, 823 (9th Cir. 2007) ("We lack jurisdiction to entertain the petition because the issuance of the press release is neither a final action nor the implementation of a final action within the meaning of [Northwest Power Act].").

Keezio's argument that the Press Release is an "order," and thus agency action, is unpersuasive. The APA defines "order" as "the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing." 5 U.S.C. § 551(6). The Press Release does not "order [Keezio] to do anything," nor does it impose "determinate consequences" beyond practical effects. *Intl. Tel. & Tel. Corp., Commun. Equip. and Sys. Div. v. Loc. 134, Intern. Broth. of Elec. Workers, AFL-*

*CIO*, 419 U.S. 428, 443, 445 (1975) (holding that an order under § 551(6) must have some "determinate consequences for the party to the proceeding" not just "practical consequences"); *see also Hoxsey Cancer Clinic*, 155 F. Supp. at 378 ("The defendants have made no order; they are adjudicating no rights; they are issuing no directions. What they are doing is disseminating information and warning the public against the use of certain medicines and of a certain treatment for internal cancer."). Nor does the Press Release fix "obligations or legal relationships." *Georator Corp. v. EEOC*, 592 F.2d 765, 768 (4th Cir. 1979) (holding that EEOC's "determination of reasonable cause to believe that the charge of discrimination filed against the plaintiff was true" was not an "order").

To be sure, the Complaint alleges significant downstream effects of the Press Release, including refunds issued by Amazon at Keezio's expense, reputational harm, and removal of products from Amazon's platform. *See* Compl. ¶¶ 103–112, 125, 127. But such market-based consequences do not transform the Press Release into an agency "order." *See Senior Executives Ass'n v. U.S.*, Civ. No. AW-12-02297, 2013 WL 1316333, at *17 (D. Md. Mar. 27, 2013) (holding that the government's planned publication of plaintiffs' financial information "is not an 'order' because it is not the final disposition of an adjudicatory process"); *Invention Submission Corp. v. Rogan*, 357 F.3d 452, 459 (4th Cir. 2004) (stating that the persuasive value of agency reports or publications do not create a reviewable agency action under the APA because such reports or publications do not create legal rights or obligations) (citing *Flue Cured Tobacco Cooperative Stabilization Corp. v. EPA*, 313 F.3d 852, 861 (4th Cir. 2002)).[4]

---

[4] In *Invention Submission*, the Fourth Circuit held that the Patent and Trademark Office's advertising campaign warning consumers about invention promotion scams did not constitute final agency action. *Id.* at 460.  Any harm to the plaintiff that resulted from independent third-party responses to the public awareness campaign "cannot be imputed to the PTO for purposes of determining whether its conduct was a final agency action." *Id.*

10

Notably, CPSC regulations provide a mechanism for seeking retraction of allegedly inaccurate or misleading disclosures. *See* 16 C.F.R. § 1101.52(b). That regulation provides, in part, that a manufacturer or other person

> may request a retraction if he/she believes the Commission or an individual member, employee, agent, contractor or representative of the Commission has made public disclosure of inaccurate or misleading information, which reflects adversely either on the safety of a product with which the firm deals or on the practices of the firm.

16 C.F.R. § 1101.52(b). Apparently, Keezio did not invoke this procedure before filing suit. *See* Def. Mem. at 10 n.9; Pl. Opp'n at 2. Instead, Keezio relies on a March 6, 2025, email requesting internal review or a hearing, but it cites no authority to show that such an email can substitute for the retraction procedure prescribed by regulation. As CPSC acknowledges, a formal retraction request would have required the agency to determine whether it had disseminated inaccurate or misleading information, culminating in a Commission "decision." *See* 16 C.F.R. § 1101.52(d); Def. Mem. at 17 n.9. That decision might constitute an agency action; the Press Release does not.

Even if the Press Release fell within the APA's definition of "agency action," it is not a *final* agency action. The Press Release did not determine Keezio's, nor any other party's, "rights or obligations[,]" nor did it impose any "legal consequences" upon Keezio. *Bennett*, 520 U.S. at 178 (citations omitted). And the facts Keezio sets forth in the Complaint do not establish that the Press Release was the "consummation of [CPSC's] decision making process[.]" *NAACP*, 945 F.3d 183, 189 (quoting *Vill. of Bald Head Island*, 714 F.3d at 194); *see also Pub. Util. Dist. No. 1*, 250 F. App'x at 823 (holding that press release "is not a final action because the press release fails both prongs of [*Bennett* finality test]").

The Fourth Circuit's recent decision in *Jake's Fireworks* is instructive. The case arose after CPSC's Compliance Office sampled fireworks imported by Jake's Fireworks and issued several Notices of Noncompliance asserting that the products were dangerously overloaded with explosive

11

materials. *Jake's Fireworks*, 105 F.4th at 630. Jake's Fireworks sought judicial review twice. In its first lawsuit, filed in 2019, it sought injunctive and declaratory relief, arguing that the Notices constituted unlawful agency enforcement action. *Id.* The district court dismissed the case, concluding that the Notices were not reviewable final agency actions because they did not mark the consummation of the Commission's decisionmaking process. *Id.* (citing *Jake's Fireworks Inc. v. U.S. Consumer Prod. Safety Comm'n*, 498 F. Supp. 3d 792, 806–07 (D. Md. 2020)). The district court emphasized two points: first, Jake's Fireworks could request an informal hearing with the Compliance Office to seek reconsideration; and second, the Notices were merely "intermediate ruling[s] of a subordinate official." *Id.* After that dismissal, Jake's Fireworks requested an informal hearing in November 2020 to challenge the Notices. When the Compliance Office declined to hold a hearing or revisit its findings, Jake's Fireworks filed a second lawsuit, again challenging the Commission's actions and alleging that it had been unable to sell over $2.6 million worth of fireworks due to fear of enforcement penalties. *Id.* at 630–31. The district court again dismissed the case. On appeal, the sole question before the Fourth Circuit was whether the Notices constituted reviewable final agency action under the APA. *Id.* The Fourth Circuit held that they did not. It explained that the Notices reflected only "preliminary findings," did not "bind" either the Commission or the company, and did not "trigger any of the administrative, civil, or criminal proceedings that the Commission could pursue." *Id.* at 632–33. Instead, the court emphasized, CPSC's investigatory and enforcement process culminates only when "the Commission itself" issues a "final order[]" announcing a definitive determination that a violation has occurred. *Id.* at 632.

Similarly here, the Press Release does not constitute a "final order" of the Commission or resolve an adjudicatory proceeding; rather, it reflects the agency's view that certain products do

not comply with applicable standards. Like the notices in *Jake's Fireworks*, the Press Release does not bind Keezio, "command any action," or itself initiate enforcement proceedings. *Id.* at 633; *see also Pharm. Mfrs. Ass'n*, 471 F. Supp. at 1227 ("The issuance of the instructions . . . seems to be a long way from constituting 'final agency action' in the sense that the CPSC is doing or proposing to do anything to the plaintiffs."); *Holistic Candlers & Consumers Ass'n v. FDA*, 664 F.3d 940, 944 (D.C. Cir. 2012) (warning letters are advisory and do not constitute final agency action); *Barry*, 2012 WL 760456, at *6 (finding that press release is not "final" agency action subject to APA review because "no rights or obligations were determined by the press release, and . . . the legal consequences faced by [plaintiff] flowed not from the press release[]").

Nor do CPSC's internal publication procedures transform the Press Release into final agency action. Although the agency must check for accuracy and fairness before publication, *see* 15 U.S.C. § 2055(b)(6); 16 C.F.R.§ 1101.1(c), such internal review does not mark the consummation of the agency's decisionmaking process where no binding determination or legal consequence follows. Indeed, as noted *supra*, Keezio has not invoked the available regulatory mechanism for seeking retraction. *See* 16 C.F.R. § 1101.52(b). Had it done so, the process would have culminated in a formal Commission decision regarding whether the disclosure was inaccurate or misleading. *Id.* § 1101.52(d)–(e). The absence of such a determination supports the conclusion that the Press Release is not final agency action.

Keezio argues that Defendants "ignore cases involving lawsuits against the CPSC where courts had no difficulty concluding" that CPSC's actions, including press releases, were final agency actions. *See* Pl. Opp'n at 17–18. First, Keezio cites *Relco, Inc. v. Consumer Product Safety Commission*, 391 F. Supp. 841 (S.D. Tex. 1975). There, the district court dismissed a challenge to a CPSC press release because the plaintiffs were "not seeking to review any finally adjudicated

determination or order." *Id.* at 847. Although the court found that the agency's warning was final "in its most certain and practical sense[,]" *id.* at 846, it held that "review of the warning must initially be brought before the agency and is not final at law until it is so brought[,]" *id.* at 847.[5] Keezio's reliance upon *Relco* is misplaced.[6]

Next, Keezio cites *Kaiser Aluminum & Chemical Corp. v. U.S. Consumer Product Safety Commission*, 414 F. Supp. 1047 (D. Del. 1976). In that case, however, CPSC conceded that the challenged publications would constitute final agency action absent a pending rulemaking. *Id.* at 1054. No such concession has been made here. Moreover, like *Relco*, *Kaiser* predates *Bennett v. Spear*, 520 U.S. 154 (1997)—which established the governing test for final agency action—by more than two decades, limiting its persuasive value.

Finally, Keezio relies heavily on *Doe v. Tenenbaum*, 127 F. Supp. 3d 426 (D. Md. 2012). There, Judge Williams of this Court held that CPSC's decision to publish, over the plaintiff's objection, a third-party report concerning an infant death constituted a final agency action. *Id.* at 459–65. The Court explained that "the Commission's decision perfected an adversarial process" defined in the statute in which the plaintiff was required to file an objection supported by "evidence," and the Commission made a "legal determination that Plaintiff failed to carry the burden of proof and that the report otherwise satisfied the statutory and regulatory preconditions for publication." *Id.* at 463. The Court emphasized that "[t]hese conditions"—"consummation of

---

[5] Notably, the court did not analyze whether the warning constituted "agency action." By contrast, courts in the Fourth Circuit "determine first" whether the challenged conduct qualifies as "agency action" before turning to the question of finality. *Golden & Zimmerman, L.L.C. v. Domenech*, 599 F.3d 426, 431 (4th Cir. 2010).

[6] Likewise, *U.S. v. 52,823 Children's Dolls, More or Less*, No. 89-CIV-4643, 1989 WL 140250 (S.D.N.Y. Nov. 13, 1989), does not advance Keezio's position. There, the court did not independently analyze whether a press release constituted final agency action, but instead relies upon *Relco* for the proposition that the issuance of a press release is itself final agency action requiring Commission approval. *Id.* at *7. As explained, *Relco* did not so hold.

14

an adversarial process" and determination of the plaintiff's "right . . . to prevent a materially inaccurate report from" being published—were central to its decision and "are not present whenever the government plans to publish controversial research or completes a multistep administrative process." *Id.* at 462–63.

*Tenenbaum* is distinguishable in several key respects. First, *Tenenbaum* involved a statutory scheme that *required* CPSC to publish certain third-party reports of harm after providing the manufacturer with notice and an opportunity to object. Here, CPSC had no "statutory mandate" or "legal obligation" to publish the Press Release. *Id.* at 460–61. Second, the plaintiff in *Tenenbaum* invoked the applicable regulatory procedures by filing a formal material inaccuracy claim, triggering an adjudicative process that culminated in a definitive agency determination. *Id.* at 461 (citing 16 C.F.R. § 1102.26(a) and U.S.C. § 2055a(c)(4)(A)). Accordingly, the Court rejected the Commission's arguments about the intermediate nature of its decision to publish a report, concluding instead that the decision was the consummation of a lengthy informal adjudication, which constituted finality for purposes of judicial review under the APA. *Id.* at 464–65. Here, by contrast, Keezio did not pursue the available regulatory mechanism for seeking retraction. And its informal communications with CPSC staff do not resemble the statutorily prescribed, adversarial process at work in *Tenenbaum*. Instead, Keezio's position is more akin to that of the plaintiff in *Jake's Fireworks* in its initial suit, where the court found that the agency's

15

decisionmaking process had not yet reached its endpoint, in part because further administrative review remained available.[7, 8]

In sum, the cases Keezio cites do not establish that the Press Release at issue in this case constitutes a final agency action. Indeed, the weight of authority suggests otherwise. Because Keezio has not established the jurisdictional prerequisites of an "agency action" that is "final," the Court lacks subject-matter jurisdiction. *See FlueCured Tobacco Coop. Stabilization Corp.*, 313 F.3d at 857. Therefore, Keezio's APA claim must be dismissed.

**B.  Due Process**

In the second count of the Complaint, asserted under 42 U.S.C. § 1983, Keezio alleges that Defendants "denied Keezio its due process rights, has unlawfully stopped the sale of all Keezio OEM Replacement Mattresses regardless of production date, and has caused Keezio to refund to customers the purchase price" of those products. Compl. ¶ 129.

Defendants argue that, although Keezio characterizes the Press Release as "false, misleading and inaccurate," there is "no constitutional doctrine converting every defamation by a public official into a deprivation of liberty" under the Due Process Clause. Def. Mem. at 17 (citing *Paul v. Davis*, 424 U.S. 693, 702 (1976)). According to Defendants, reputational harm alone—

---

[7] Notably, Keezio's Complaint alleges that it exhausted administrative remedies; however, Keezio does not dispute that it did not follow 16 C.F.R. § 1101.52(b) to request a retraction. *See* Pl. Opp'n at 2 ("…Defendants assert that Keezio should have sought a retraction directly from the CPSC [16 C.F.R. § 1101.52(b).] This ignores Keezio's requests for independent review by the Commission's general counsel and, failing that, a hearing before the Commission both of which were rejected.").

[8] Keezio requests, and CPSC does not oppose, that this Court take judicial notice of a public statement by Commissioner Feldman and former Commissioner Dziak explaining their abstention from a Commission vote on whether to retract a statement in an unrelated matter involving a product sold by Dreamland Baby. *See* ECF Nos. 24 & 24-2. As relevant here, Feldman and Dziak expressed the view that Dreamland Baby was not without recourse for the challenged public statements and that the requested relief is best pursued in federal court because the statements constituted "final agency action." *Id.* In support, the Commissioners cited *Doe v. Tenenbaum*, 127 F. Supp. 3d 426, 465 (D. Md. 2012). As explained above, however, *Tenenbaum* is materially distinguishable from this case.

absent a more tangible interest—does not implicate any protected liberty or property interest. *Id.* And Keezio, Defendants argue, fails to identify any specific property interest of which it has been deprived. *Id.* Instead, the Complaint alleges harm to Keezio's business, including Amazon-issued refunds, reputational damage, and removal of its products from Amazon's platform. *Id.* (citing Compl. ¶¶ 103–112, 124, 127, 129). Defendants contend that these harms do not reflect a "distinct[]" change in legal status but instead "flow[] from injury … to a plaintiff's reputation." *Id.* (quoting *Siegert v. Gilley*, 500 U.S. 226, 234 (1991)). Defendants therefore maintain that Keezio's alleged financial losses are not a sufficiently direct deprivation of property to state a due process claim. *Id.* at 25.

Keezio responds that, although reputational harm alone is insufficient, a due process claim may arise where such harm is coupled with state action that distinctly alters or extinguishes legal status. Pl. Opp'n at 18. Keezio contends that the Complaint plausibly alleges such a deprivation. *Id.* In particular, Keezio argues that when CPSC "condemns a product as inherently dangerous and unfit, that denouncement may be tantamount to an economic death knell." *Id.* (quoting *Relco*, 391 F. Supp. at 846). Keezio alleges that the Notice of Violation and Amended Notice directed it to stop selling its products, and that the Press Release—disseminated by Amazon at CPSC's request—caused widespread refunds, chargebacks, and removal of its products from the marketplace. *Id.* According to Keezio, the combined effect of these actions was "tantamount to a product ban," effectively extinguishing its ability to sell its products. *Id.* Keezio further asserts that the resulting chargebacks and lost revenue constitute a tangible deprivation of property directly traceable to CPSC's conduct. *Id.*

The second count of the Complaint does not state a plausible due process claim. The Fifth Amendment's Due Process Clause provides that no person shall be "deprived of life, liberty, or

property, without due process of law." *See* U.S. Const. amend. V. "Like its Fourteenth Amendment counterpart, Fifth Amendment due process has both 'substantive and procedural components.'" *D.B. v. Cardall*, 826 F.3d 721, 739 (4th Cir. 2016) (citation omitted). A procedural due process claim requires that Keezio show "(1) [it] had property or a property interest (2) of which [CPSC] deprived [it] (3) without due process of law." *Sunrise Corp. of Myrtle Beach v. City of Myrtle Beach*, 420 F.3d 322, 328 (4th Cir. 2005) (citation omitted). A substantive due process claim requires (1), again, "property or a property interest; (2) that the [government] deprived [Keezio] of this property or property interest; and (3) that the [government's] action falls so far beyond the outer limits of legitimate governmental authority that no process could cure the deficiency." *Id.* (citation omitted). "To establish a substantive due process violation, the plaintiff must show that [the government actor's] behavior was 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" *Dean ex rel. Harkness v. McKinney*, 976 F.3d 407, 413 (4th Cir. 2020) (citation omitted).

Here, Keezio fails to allege that it had a cognizable property interest of which CPSC deprived it or any other conduct by CPSC that may fairly be said to shock the contemporary conscience. Accepting the facts in the Complaint as true, there is no doubt, as Keezio argues, that "CPSC's actions caused real and substantive effects on Keezio's business." Pl. Opp'n at 18. But "[e]vidence of the impact on [a plaintiff's] market share and sales . . . does not show that its property right—the ability to sell its product lawfully—has been deprived by [the government] and instead, shows third party and market reactions to [the government's action]." *Mallinckrodt Inc. v. FDA*, Civ. No. DKC-14-03607, 2015 WL 13091366, at *17 (D. Md. July 29, 2015).

In *Mallinckrodt*, a pharmaceutical company alleged that its approved drug had been "effectively taken off the market" and its property rights impaired after the FDA changed the

drug's therapeutic equivalence rating, which in turn led pharmacists and distributors to stop purchasing or dispensing it. *Id.* at \*16. The court distinguished between a cognizable deprivation—where "the property itself or the use or benefit of the person's property interest [is] taken for a short period of time"—and the broader, rejected proposition that due process requires notice and a hearing before any government action that merely affects a product in which a party has an interest. *Id.* Because the FDA had not suspended or revoked the plaintiff's authority to sell its drug, the court held that no property deprivation had occurred. *Id.* Instead, the plaintiff's losses were caused by independent third parties who reacted to the FDA's rating but were not compelled by it. *Id.* The court explained that such "consequential impacts"—including "the decrease in market share and financial losses"—were "not a sufficiently direct deprivation of property to state a due process violation." *Id.* at \*16–17.

The same reasoning applies here. Keezio does not allege that CPSC prohibited or otherwise eliminated its ability to sell its products. Rather, Keezio alleges that its mattresses were "effectively taken off the market" because Amazon chose to issue refunds and cease sales.[9] "This indirect effect … can hardly be said to constitute a constitutional deprivation of property deserving fifth amendment protection." *Indus. Safety Equip. Ass'n, Inc. v. EPA.*, 837 F.2d 1115, 1122 (D.C. Cir.

---

[9] To the extent Keezio argues that the Amended Notice of Violation is the source of a constitutional deprivation, that theory is also unpersuasive in light of *Jake's Fireworks*. There, the Fourth Circuit held that similar CPSC notices were not final agency action because they did not consummate the agency's decisionmaking process. 105 F.4th at 634. Although the court did not address whether such notices have "direct and appreciable legal consequences," *id.* at n.4, the Fourth Circuit has made clear that where a "preliminary determination is without legal effect in and of itself, due process is satisfied so long as there is an opportunity to be heard before any final agency action becomes effective." *Georator*, 592 F.2d at 768–69 (citing *Ewing v. Mytinger & Casselberry*, 339 U.S. 594, 598 (1950)). Here, Keezio does not allege that the Amended Notice was final agency action or had binding effect. Instead, its Complaint alleges, in its second count, that CPSC "caused Keezio to refund to customers" and seeks relief in the form of a retraction of the Press Release. Compl. ¶¶ 129, 131. These allegations confirm that Keezio's claimed injury stems from third-party reactions to the Press Release, not from any government action that altered Keezio's legal rights or obligations.

1988). Keezio has not alleged that it has been deprived "some benefit to which [it] ha[s] a legal right." *Gen. Elec. Co. v. Jackson*, 610 F.3d 110, 121 (D.C. Cir. 2010).[10]

Nor does Keezio fall within the line of cases holding that a due process violation may arise when, in addition to reputational harm, "the government-imposed stigma is so severe that it 'broadly precludes' plaintiffs from pursuing 'a chosen trade or business.'" *Gen. Elec. Co*, 610 F.3d at 121 (quoting *Trifax Corp. v. District of Columbia*, 314 F.3d 641, 644 (D.C. Cir. 2003)). In *Old Dominion Dairy Products, Inc. v. Sec. of Def.*, the D.C. Circuit held that due process required the government to provide a contractor notice of charges that the contractor lacks honesty or integrity because contractors unfavorably audited by the government, though not formally debarred, are "effectively put . . . out of business." 631 F.2d 953, 963 (D.C. Cir. 1980). Plaintiffs claiming such "broad preclusion" must allege something approaching "formal exclusion from a chosen trade or profession," not merely claims analogous to defamation. *Trifax Corp.*, 314 F.3d at 644. The facts alleged in Keezio's Complaint do not meet this demanding standard.[11]

The Complaint fails to state a plausible due process claim in its second count. Therefore, it must be dismissed.

---

[10] I do not mean to trivialize the impact that CPSC's statement had on Keezio's business. But it is well established that market impact alone cannot sustain a due process claim. As the Fourth Circuit observed in its APA analysis in *Flue–Cured Tobacco*, it is unlikely that "Congress intended to create private rights of actions to challenge the inevitable objectionable impressions created whenever controversial research by a federal agency is published. Such policy statements are properly challenged through the political process and not the courts." 313 F.3d at 858; *see also Invention Submission Corp.*, 357 F.3d at 459 (quoting the same).

[11] Among other things, Keezio alleges that it is currently engaged in the business of selling toddler sleep products, that its reputation has made it a market leader, and that it is among the largest children's brand companies in the United States. *See, e.g.*, Compl. ¶¶ 8, 17, 20, 21.

## V.    CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss, ECF No. 20, shall be granted, and the Complaint shall be dismissed without prejudice. Plaintiff's Motion to Take Judicial Notice, ECF No. 24, shall also be granted.

A separate Order will issue.

Date:   April 22, 2026   

Matthew J. Maddox
United States District Judge

21